UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| SARAH MCPHERSON, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 1:20-cv-126 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| METROPOLITAN SECURITY | ) | Magistrate Judge Christopher H. Steger |
| SERVICES, INC., d/b/a | ) | |
| WALDEN SECURITY, | ) | |
| | ) | |
| *Defendant.* | ) | |

**M E M O R A N D U M**

Before the Court is a motion for summary judgment on Plaintiff Sarah McPherson's three remaining claims by Defendant Metropolitan Security Services, Inc. d/b/a Walden Security ("Walden Security"). (Doc. 32.) Plaintiff has filed a response in opposition (Doc. 34), and Defendant has replied (Doc. 37). The matter is now ripe for review.

I. **BACKGROUND**

Defendant Walden Security is a corporation providing security services in Hamilton County, Tennessee.[1] Defendant employed Plaintiff from November 6, 2015, to August 6, 2019. Plaintiff started as a Training Administrator and was promoted to Human Resources Assistant in September 2016. She was promoted to Learning Management Systems Administrator in April 2017, upon which she worked at Defendant's corporate office in Chattanooga, Tennessee. In January 2019, she was promoted to Learning Development Manager, for which her duties included creating trainings and assisting with corporate orientation. Plaintiff's supervisor from April 2017

---

[1] Factual disputes and reasonable inferences regarding the underlying facts are presented in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

through August 6, 2019, was Jason Crowe, the Learning and Development Director. Crowe's supervisor was Lauren Tudor, Executive Vice President of Sales, Marketing, and Learning and Development. After Plaintiff was promoted to Learning and Development Manager, Megan Bell joined Defendant as the Learning and Development Coordinator, with Plaintiff as Bell's supervisor. Through the course of Plaintiff's employment with Defendant, Kurt Schmissrauter was Vice President and General Counsel; he performed only legal functions and not human resources work. Dee Smith started at Walden Security as Benefits Manager and was promoted to Human Resources Director in October 2018. Smith reported directly to Schmissrauter, including consulting with him regarding terminations. Schmissrauter and Mike Walden, President of Walden Security, made the final decision on employee terminations.

Plaintiff wanted to continue advancing within Walden Security, so she looked at other positions within the company. She had also felt that Crowe was becoming more controlling of her, as evidenced by a text message Crowe sent where he referred to her application to another position in a joking manner. In November 2018, Plaintiff explored a position within the Sales Division, but in January 2019, Crowe told Plaintiff the position was no longer on the table. In June 2019, Plaintiff expressed interest in the Director of Quality Assurance position and applied while she was on vacation. She told Crowe about her application, but he did not respond. On June 24, 2019, Plaintiff emailed Tudor and Crowe requesting a meeting to discuss career planning. Neither Tudor nor Crowe responded. On June 25, 2019, when Plaintiff went into the office, Crowe asked Plaintiff to come with him to discuss her June 24, 2019, email. They walked across the street from Defendant's corporate office to Miller Park, where they sat across from each other

about arms-length apart at a table in the park. Both Crowe and Plaintiff remained seated during this meeting and there was no physical contact between them.

Plaintiff testified in a deposition that Crowe said she was selfish and greedy for applying to the Director of Quality Assurance position and that she would only get a courtesy interview. She testified that he ridiculed her for thinking that she could get a director-level position, and he spoke in a derogatory and demeaning manner. He said that they were not looking for a "Sarah," that she "ruined her brand," her June 24, 2019, email was a "slap in the face" to him, and her decision-making abilities were in question. (Doc. 34-1 at 16, 25, 26.) Plaintiff testified that at times, Crowe raised his voice and flailed his arms. She asked repeatedly to end the meeting, but he did not; she felt like she could not leave the meeting because she was frozen in place. At times, Crowe cut her off when she tried to respond or answer his questions. Plaintiff started crying and shaking during the meeting. She testified that Crowe ended the meeting by standing up and slamming his chair into the table, and he told her, "I get it. You just hate your job." (Doc. 34-1 at 24.)

After the June 25, 2019, meeting, Crowe started excluding Plaintiff from conversations and meetings and reassigned the majority of her job responsibilities to Bell. After Plaintiff received a call from Human Resources to schedule an interview for the Director of Quality Assurance position, she saw no reason to pursue the position. In mid-July, Plaintiff approached Schmissrauter to request a meeting to discuss the June 25 meeting, but he never met with her. A few days after that, Crowe told Plaintiff he was going to be in a meeting, so she thought it would be a good time

to schedule a time to meet with Schmissrauter. But when she arrived at Schmissrauter's office, he was in a meeting with Crowe and Tudor with his door closed.

On July 31, 2019, Plaintiff sent an email with the subject "Assistance Needed" to Schmissrauter and HR Director Smith regarding her June 25, 2019, meeting with Crowe and the mental distress that she was experiencing as a result of it. She requested to take some personal days off, including Wednesday, July 31, 2019, and Thursday, August 1, 2019. On August 1, 2019, Plaintiff sent a third email to Smith and Schmissrauter to let them know that she was going to use a sick day for Friday, August 2, 2019. Specific quotations from Plaintiff's emails are included below in Section III.

Schmissrauter and Smith met with Crowe on August 1, 2019, concerning Plaintiff's complaints against Crowe. In a deposition, Smith testified that Schmissrauter took the lead in handling Plaintiff's complaint and Smith did not follow Defendant's normal Human Resources procedures for addressing employee complaints, such as referring Plaintiff's complaint to an ad hoc committee to review findings. Smith said that she was not aware of any investigation conducted with regard to Plaintiff's complaint against Crowe.

Smith and Schmissrauter asked Plaintiff to meet with them on Monday, August 5, 2019. Plaintiff testified she came into the corporate office that day for the sole purpose of meeting with Smith and Schmissrauter as they had requested. She testified that she sensed Smith's and Schmissrauter's attitudes toward her had changed. Schmissrauter told Plaintiff that they had already spoken with Crowe and that the meeting in Miller Park was a "miscommunication." (Doc. 32-15 at 2.) Smith told Plaintiff that she would be given Family and Medical Leave Act ("FMLA") paperwork by the end of the day. Plaintiff testified that she told them she did not want to lose her job and she just needed more time to get through her symptoms so she could continue working for

4

Defendant.  She felt that Smith and Schmissrauter were telling her that she could not apply for FMLA because what had happened to her was not severe enough.  She also felt confused because although they said they were simply waiting on her FMLA paperwork, she got the sense that she would be terminated if she did not return to work.  Plaintiff testified in her deposition that she would not leave her job with Defendant without giving two weeks' notice because it would affect her ability to be hired for another job.  (Doc. 34-1 at 76.)

After the August 5 meeting, Plaintiff sent an email to Smith and Schmissrauter expressing her concerns about the meeting and asking, "If I do not feel that a meeting with them[2] is in my best interest for my mental health does that mean termination?"  (Doc. 32-15 at 5.)  Smith responded, "If you are unwilling to continue in your current position with Walden Security we do not have anything else available at this time."  (*Id.* at 4.)  Plaintiff responded, "I am not unwilling to continue, according to medical advice it is not in my best interest for my mental health."  (*Id.* at 3.)  On August 6, 2019, Schmissrauter sent an email to Plaintiff stating, "we cannot conclude that there has been any violation of company policy or other improper action that would render it inappropriate for you and [Crowe] to continue working together."  (*Id.*)  Plaintiff responded that she would be contacting an attorney and rejected Schmissrauter's characterization of the incident as a miscommunication.  Schmissrauter subsequently replied: "It is our understanding that you have chosen to end your employment with Walden Security and you are contacting an attorney. . . . Be advised that your Walden e-mail will be promptly shut-off upon receipt of this e-mail."  (Doc. 37-7 at 2.)  Plaintiff testified in her deposition that she immediately sent a reply email to Schmissrauter stating that she was not quitting her employment.  While she was trying to download

_____

[2] Plaintiff explained in her deposition that "meeting with them" referred to meeting with Tudor and Crowe.  (Doc. 34-1 at 76.)

5

a copy of that email, a warning alert popped up that said she was disconnected from Defendant's server; she did not receive a reply to that email.

Meanwhile, during July and August 2019, Plaintiff sought medical treatment at Hitchcock Family Medicine. She sent a text message to Dr. Matthew Hitchcock on Wednesday, July 31, 2019, at 9:43 a.m.: "I'm having a super stressful time. A confrontational incident happened at the end of June with my boss and since then I'm noticing that I've developed some sort of stress anxiety when I go to work . . . Do you have any recommendations?" (Doc. 32-7 at 5.) Dr. Hitchcock responded, "You need a therapist. Do you have one?" (*Id.* at 4.) He provided the business card of Shelby Gregory, MA, at Journey Psychotherapy Center. (*Id.*) On August 6, 2019, at 3:47 p.m., Plaintiff texted Dr. Hitchcock to ask that her July 31 text be "officially document[ed]" and said that returning to work with Crowe "is only going to make my symptoms worse." (*Id.*) Dr. Hitchcock responded that the text was in her record and said, "You may want to email Dr. Smith and come in to see her." (*Id.*) On August 7, 2019, Plaintiff had an in-person visit with Dr. Ashley Sanders, another physician at Hitchcock Family Medicine. The appointment records note that Plaintiff was "[e]motionally distressed and crying often during appointment." (Doc. 37-3 at 6.) The assessment and plan states that Plaintiff "[c]an get physical manifestations of emotional stress which is likely what she was feeling" and that Plaintiff was "[e]ncouraged to establish with therapist, [which she] will do as finances allow." (*Id.*) Plaintiff was prescribed twenty tablets of ten-milligram hydroxyzine hydrochloride, of which she was to take one tab by mouth every eight hours as needed for anxiety and insomnia. (*Id.*)

On May 20, 2020, Plaintiff filed this lawsuit against Defendant asserting five causes of action: sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101; a hostile work

environment based on sex; retaliation under Title VII; violation of the FMLA, 29 U.S.C. § 2601; and violation of the Tennessee Healthy Workplace Act ("THWA"), Tenn. Code Ann. § 50-1-503. (Doc. 1.)  The Court granted Defendant's motion for partial dismissal, dismissing with prejudice Plaintiff's sex-discrimination claims under Title VII and the THRA and dismissing without prejudice Plaintiff's THWA claim.  (Doc. 19.)  Plaintiff's hostile work environment, unlawful retaliation, and FMLA claims remained.  On June 3, 2022, Defendant filed a motion for summary judgment on Plaintiff's remaining claims.  (Doc. 32.)  Plaintiff responded in opposition (Doc. 34), and Defendant replied (Doc. 37).

## II.     STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing no genuine issue of material fact remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

If the moving party meets its initial burden, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  A genuine issue for trial exists if there is "evidence on which the jury could reasonably find for the plaintiff." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (internal quotations omitted).  In addition, should the nonmoving party fail to provide

evidence to support an essential element of its case, the movant can meet its burden by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 248–49. The court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). If the court concludes, based on the record, that a fair-minded jury could not return a verdict in favor of the nonmovant, the court should grant summary judgment. *Anderson*, 477 U.S. at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.  DISCUSSION

Defendant moves for summary judgment as to each of Plaintiff's three remaining claims. The Court first turns to Plaintiff's hostile work environment claim under Title VII, then to her retaliation claim under Title VII and the THRA, and finally to her FMLA interference and retaliation claim.

### A.  Hostile Work Environment Because of Sex-Based Harassment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual because of such individual's gender. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting 42 U.S.C. § 2000e–2(a)(1)). "A plaintiff may establish a violation of Title VII by proving that the discrimination based on sex created a hostile or abusive work environment," which occurs where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Williams*, 187 F.3d at 560. To prevail on

8

a prima facie hostile work environment claim, a plaintiff must show: (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome harassment; (3) the harassment complained of was based on sex; (4) the charged harassment created a hostile work environment; and (5) the employer is liable. *Wyatt v. Nissan North Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021); *Smith v. Rock-Tenn Services, Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).

Title VII recognizes that nonsexual conduct may be sex-based, and thus in violation of Title VII, when "it evinces 'anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Williams*, 187 F.3d at 565 (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988)). To establish that the harm was based on her sex, a plaintiff "must show that but for the fact of her sex, she would not have been the object of harassment." *Williams*, 187 F.3d at 565 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). Title VII requires a plaintiff to be "exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Furthermore, a plaintiff asserting a claim of a hostile work environment must next prove that the environment was subjectively and objectively hostile, such that both the plaintiff herself and a reasonable person would have found the environment to be hostile. *Smith*, 813 F.3d at at 309 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). "When assessing the hostility of a work environment, courts and juries consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Smith*, 813 F.3d at 309 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). The court must consider the totality of the circumstances: "isolated incidents (unless extremely serious)

9

will not amount to discriminatory changes in the terms and conditions of employment." *Fargaher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Here, Plaintiff claims that she was subjected to a hostile work environment "[a]s a result of the abusive and demeaning treatment" from Crowe. (Doc. 34 at 1, 4.) Plaintiff, in her deposition, testified that she had observed Crowe becoming more controlling of her as she looked at different job positions with Defendant. (*Id.* at 2.) For instance, in approximately November 2018, she explored a position in Sales, but in approximately January 2019, Crowe told her the position was no longer "on the table" for her. (*Id.*) She specifically highlights her meeting with Crowe on June 25, 2019, at Miller Park. (*Id.*) Plaintiff had applied for the available position of Director of Quality Assurance and had informed Crowe by email that she had done so. (*Id.*) According to Plaintiff, at this meeting Crowe "proceeded to verbally attack [her], stating that she was selfish and greedy for applying for the position and that she would only get a 'courtesy' interview." (*Id.* at 3.) Crowe stated that "they were not looking for a 'Sarah,'" she had "ruined her brand," and that her email to him was a "slap in the face." (*Id.*) Crowe also said that "as a result of her email, her decision-making abilities were in question." (*Id.*) Crowe raised his voice at her and flailed his arms. (*Id.*) Plaintiff started crying and shaking as a result of the encounter, which left her feeling "very embarrassed and humiliated." (*Id.*) After the meeting, Crowe started excluding Plaintiff from conversations and meetings and reassigned many of her job responsibilities to Megan Bell, another employee with Defendant, which Plaintiff claims constitutes disparate treatment under Title VII. (*Id.*)

Plaintiff argues that Crowe's behavior was "clearly controlling, demeaning and abusive towards [her], unlike his behavior toward his male subordinates which was very respectful," which thus "shows that his abusive and demeaning treatment was due to [Plaintiff's] gender as it would

10

not have occurred if she was not female." (*Id.* at 3–4.) Furthermore, Plaintiff argues that the totality of the circumstances demonstrates that the work environment was objectively hostile because Smith, the HR director, testified that it is inappropriate to discuss Defendant's proprietary information in public (*i.e.*, in Miller Park, a public setting), it is inappropriate for a supervisor to make derogatory or demeaning comments to a subordinate, and that it could be grounds for disciplinary action for a supervisor to threaten to terminate a subordinate's employment or to make derogatory or demeaning comments to a subordinate. (*Id.* at 4.) Citing *Wyatt v. Nissan North America*, 999 F.3d 400, 411 (6th Cir. 2021), Plaintiff argues Crowe's request for the meeting to be in Miller Park "was clearly to intimidate and abuse her as he felt free to scream and yell and flail his arms at her in a threatening manner with no one present to protect [her]," which "causes the incident to be more severe." (*Id.* at 4–5.) Finally, Plaintiff "testified that she believed that she was being 'kept in her place' as a woman by a male supervisor that she believed that she was not worthy of promotion outside of his department due to her gender." (*Id.* at 5.)

Defendant argues that Crowe's statements and conduct during the June 25, 2019, meeting may have been unprofessional or inappropriate, but he did not say anything specific to Plaintiff's sex, nor did he say anything sexually explicit or degrading to women, such as sex-specific epithets. (Doc. 37 at 5.) Additionally, Defendant argues that Plaintiff failed to demonstrate disparate treatment because Crowe did not actually have any male subordinates, only unidentified field trainers who do not report to him and are not under his direct control. (*Id.* at 5–6.) And Defendant argues that it is immaterial that Crowe assigned some of Plaintiff's job responsibilities to Bell, Plaintiff's subordinate female coworker. (*Id.* at 6.) Finally, Defendant argues that Plaintiff failed to establish the fourth prong of her prima facie hostile work environment claim. (*Id.*) First, Defendant argues that Smith's testimony stating it would be inappropriate to discuss Defendant's

proprietary information in public is irrelevant for whether the June 25, 2019, meeting in Miller Park was sex-based or that it created a hostile work environment. (*Id.*) Second, Defendant argues that *Wyatt* is distinguishable from the facts here because it involved a male supervisor exposing his genitals to a female employee and sexually propositioning her while they were in a hotel room after she was taken there under false pretenses. 999 F.3d 400, 411 (6th Cir. 2021).

After considering all the evidence in the light most favorable to Plaintiff, the Court agrees with Defendant. The evidence that Plaintiff has marshalled in support of her claim for sex-based harassment leading to a hostile work environment cannot support the third and fourth elements of a prima facie hostile work environment claim.

First, for the third prong, no reasonable jury could find that Plaintiff experienced harassment on the basis of her sex. Plaintiff belabors the point that she had wanted to advance within Walden Security and she was promoted under Crowe's management because of her work record, skills, and experience, but that does not render Crowe's "displeasure" at her desire to leave her position sex-based harassment. If anything, the facts suggest that Crowe had a non-sex-based reason behind for his statements and behavior, such as wanting to keep a competent employee as one of his subordinates.

The Court also agrees with Defendant that nothing in the June 25, 2019, meeting could constitute harassment on the basis of Plaintiff's sex. Plaintiff even states in her response to Defendant's motion for summary judgment that the conversation arose as Crowe's reaction to her email. (Doc. 34 at 3 ("He said that, as a result of her email, her decision-making abilities were in question.").) Nowhere in Plaintiff's extensive deposition testimony does she state that Crowe had used sex-specific epithets or language that is directed at women and motivated by discriminatory animus. Crowe said that "they weren't looking for . . . 'a Sarah'" (Doc. 34-1 at 109) and that her

email to him was a "slap in the face" (*Id.* at 126–27) with which she "ruined [her] brand" (*Id.* at 100). That is a far cry from what the Court of Appeals for the Sixth Circuit considered to be harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women in the seminal case *Williams v. General Motors Corp.*, 187 F.3d 553 (6th Cir. 1999). There, the plaintiff's male coworkers had repeatedly used gender-specific epithets such as "slut" and "f**king women." *Id.* at 565–66. Here, Plaintiff can only state that she *felt* like she was not equal to Crowe because she is a woman and he is a man, but she has failed to point to any language or conduct during the June 25, 2019, meeting (or even outside of that) that demonstrated Crowe was motivated by discriminatory animus toward women.

Second, for the fourth prong, no reasonable jury could find that there was objectively a hostile work environment based on Plaintiff's facts as given. Plaintiff may have established a subjectively hostile work environment based on how she personally felt, but that is insufficient for the purposes of Title VII, which requires there to be "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The objective prong is one of Title VII's strict guardrails to prevent its expansion into a "general civility code" for the workplace. *Oncale*, 523 U.S. at 80. The June 25, 2019, meeting between Plaintiff and Crowe does not arise to the level of objectively severe or pervasive conduct covered by Title VII. Plaintiff's argument that the totality of the circumstances show that the environment was objectively hostile is unavailing. Smith, Defendant's former director of HR, did provide deposition testimony suggesting that it could have been inappropriate for Crowe to have acted the way he did toward Plaintiff, but that is not enough. Conduct cannot be merely offensive, obnoxious, or mean—it must be conduct that a reasonable person in Plaintiff's position would find severely hostile or abusive. *See Williams*, 187 F.3d at

13

563–64.  Moreover, Plaintiff distorts the holding in *Wyatt* to argue that the location of the June 25, 2019, meeting with Crowe—Miller Park, instead of Walden Security's office—rendered the incident "more severe" because it involves an element of physical invasion.  *Wyatt* involved an incident in which a female subordinate employee was taken to a hotel room under false pretenses where her male supervisor sexually propositioned her, exposed his genitals to her, tried to embrace her, and then physically prevented her from leaving by placing his hand on the door.  999 F.3d at 408–09.  Here, Plaintiff agreed to meet with Crowe in Miller Park, which is a public location right across the street from Walden Security's office.  They were seated at a table, arm's length apart, and Plaintiff was free to leave at any time (although she says she did not leave because she felt "frozen").  (Doc. 34-1 at 129.)  There was no physical contact whatsoever between Crowe and Plaintiff.  Significantly, *Wyatt* involved a private, enclosed room, while the encounter here occurred in a public park.  *Wyatt* is inapposite.

Plaintiff has failed to demonstrate that there is a genuine issue of material fact for trial.  Accordingly, the Court will dismiss Plaintiff's claim that she was subjected to a hostile work environment on the basis of her sex.

### B.    Retaliation Under Title VII and the THRA

Plaintiff brings claims alleging unlawful retaliation under Title VII and the THRA.  "Claims under the THRA are analyzed in the same manner as those under Title VII."  *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 213 F. Supp. 3d 951, 959 (E.D. Tenn. 2016) (citing *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)).  Thus, the Court will address Plaintiff's retaliation claims under both statutory frameworks simultaneously instead of parsing them out separately, and so, when the Court discusses Title VII, the same applies to the

14

analysis under the THRA.  *See also Manstra v. Norfolk Southern Corp.*, 2012 WL 1059950 at *9

(E.D. Tenn. Mar. 28, 2012) (citing *Kessler v. Riccardi*, 363 F. App'x 350, 355 (6th Cir. 2010)).

> Under Title VII, to establish a prima facie case of retaliation, a plaintiff must show:
>
> (1) that she engaged in activity protected by Title VII; (2) that this exercise of protected rights was known to the defendant; (3) that the defendant thereafter took adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action.

*Pittington*, 213 F. Supp. 3d at 959.  To come within the protection of Title VII, a plaintiff "must

establish that [s]he challenged an employment practice that [s]he reasonably believed was

unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (citing

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)).  Protected activity includes "a

demand that a supervisor cease his/her harassing conduct," but it does not include "merely a 'vague

charge of discrimination.'" *Yazdian*, 793 F.3d at 645 (first quoting *EEOC v. New Breed Logistics*,

783 F.3d 1057, 1067 (6th Cir. 2015); then quoting *Booker v. Brown & Williamson Tobacco Co.*,

879 F.2d 1304, 1313 (6th Cir. 1989)).  An employee's complaints that are too "ambiguous" and

do not mention the employee's belief that she was discriminated against are insufficient to alert

the employer that the plaintiff was opposing an unlawful employment practice, so they do not

constitute protected activity.  *Yazdian*, 793 F.3d at 645.  Under Sixth Circuit precedent, "a vague

charge of discrimination in an internal letter or memorandum is insufficient to constitute

opposition to an unlawful employment practice." *Manstra*, 2012 WL 1059950 at *10 (quoting

*Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007)).

> Here, Defendant disputes whether Plaintiff was engaged in activity protected by Title VII,

whether Defendant took an adverse employment action, and whether there was a causal connection

between the protected activity and the adverse action.  Because Plaintiff has not introduced any

evidence that she engaged in protected activity covered by Title VII, which is the necessary

prerequisite for a retaliation claim, the Court will not delve into the other two contested elements of whether there was an adverse employment action and whether there was a causal connection.

On July 31, 2019, at 1:05 p.m., Plaintiff sent an email to Schmissrauter and Smith with the heading "Assistance Needed." (Doc. 34-1 Ex. 7 at 1.) In relevant part, this email said,

- I know I cannot work around Jason anymore. Every day is a struggle for me to work around him or even see him. It sets off anxiety, fear that I have to experience another situation as I experienced back in June (details below) or the continuous treatment he does towards me regularly. (*Id.*)
- We stopped at the tables in Miller Park and he said to sit so we can "talk" which proceeded into a confrontational attack. (*Id.*)
- I felt so disrespected, embarrassed.. [sic] confused as to how an email asking to discuss where I could take my career with a company that I have been loyal to and dedicated my service to, could be escalated so quickly and treated unfairly. (*Id.* at 2.)
- I don't think email can truly express the situation. I know this email is lengthy but I did my best to recount and provide the needed details to help you both understand what I've been through and continuously deal with. *Kurt- when I asked to spend some time with you to discuss career questions, I wanted to talk about this situation in person but I didn't want to talk about it until I was safe in your office.* (*Id.* (emphasis in original).)
- "As much as it hurts me to take this action, . . . I'm trying to look for other employment." (*Id.*)

Plaintiff sent an email titled "Follow-up #2" on August 5, 2019, at 4:36 p.m., asking, "If I do not feel that a meeting with them is in my best interests for my mental health does that mean termination? If so, [w]hen would be my last pay and would I be given any of my vacation pay?" (Doc. 34-1 at 84.) Smith responded to explain how her paid time off would be paid out. (Doc. 34-1 at 85.) Plaintiff replied, "After almost 4 years of loyal employment, because I was mistreated and attacked for wanting to discuss a career plan, my only 2 options are to continue under [Crowe] or no employment . . . ?" (*Id.*)

On August 6, 2019, Schmissrauter sent an email to Plaintiff stating,

After our initial discussions and investigation, you wrote again to me and indicated your belief that you had been subjected to harassment and retaliation. . . . I therefore asked you, as I had before, to provide any additional detail so that I could

16

understand in what basis you believed you had been subjected to harassment or retaliation. You have not provided any additional detail or information.

(Doc. 34-1 at 87–88.) Plaintiff replied at 9:47 a.m.: "I was retaliated against by my current boss because I wanted to leave the department. He took me off company property and verbally attacked me." (*Id.* at 1.) She wrote, "I deserve better than how I've been treated over the last 30+ days and even more so this past week when I contacted my Legal and HR team. . . . I thought the company was above how [Crowe] treated me. All of this because I wanted to talk to my leadership about 'Career Planning.'" (*Id.*) She also wrote, "I gave you an opportunity to get me out of the toxic situation I was under. I have had several interactions between me and the company that the company went unmet." (*Id.*) Her email concluded, "I'm contacting an attorney and we'll go from there." (*Id.*)

Defendant argues that Plaintiff's July 31, 2019, email merely expressed her frustration with how Crowe had handled her desire for a promotion because it outlined how she felt about their June 25, 2019, meeting in Miller Park. (Doc. 32 at 14.) Plaintiff's email "made no mention of her gender," and her August 5, 2019, email clarified that she was complaining specifically about Crowe's management style. (*Id.*) Thus, "her 'complaint' was nothing more than vague allegations that she felt her supervisor was treating her unfairly." (*Id.*) Defendant urges this Court to follow *Manstra v. Norfolk Southern Corp.*, 2012 WL 1059950, at *11 (E.D. Tenn. Mar. 28, 2012), where this Court held that the plaintiff's complaints (including an EEOC complaint) did not constitute protected activity for the purposes of a retaliation claim because they were about the "'stern,' 'harsh,' or 'condescending'" manner in which her supervisors spoke to her. This Court reasoned, "While plaintiff may have complained and reported that her supervisors were acting unfairly or

harshly, this type of complaint does not constitute protected activity about matters made unlawful by Title VII or the THRA." *Id.*

In response, Plaintiff asserts that her "complaints were more than mere 'frustrations'" and that "[t]hese were not merely 'vague allegations' . . . of being treating [sic] unfairly or harshly by her supervisor with no relation to her gender." (Doc. 34 at 13.) She again argues, "This involved an unusual situation where a supervisor takes an employee away from work to another location in order to berate, intimidate, and abuse the employee. It is not surprising that [Plaintiff] felt afraid and humiliated by Mr. Crowe's actions." (*Id.*)

But based on the record as presented, it appears that Plaintiff's email exchanges with Schmissrauter and Dee were precisely the type of allegations that this Court has held to be insufficient for triggering the protection of Title VII or the THRA. In *Philip v. Wrigley Manufacturing Co., LLC*, the plaintiff had complained about his supervisor's use of profanity while yelling at him and what he referred to as "other issues" in emails to executives of the defendant corporation. 2010 WL 4318880, at *2, *3 (E.D. Tenn. Oct. 22, 2010). This Court reasoned that because the plaintiff's complaints "did not take an overt stand against discrimination, did not mention the term discrimination, and there is no evidence recipients of the complaints understood them to be charging discrimination," they did not qualify as protected activity. *Id.* at *12 (quoting *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009)).

Here, like in *Philip*, Plaintiff has submitted the types of complaints that do not qualify as protected activity for the purposes of Title VII and the THRA, so they are not actionable even if those emails were sent leading up to her departure from Walden Security. Not once in any of her emails did Plaintiff write "discrimination," "gender," "sex," "woman," "female," or any terms connected to sex discrimination. Defendant simply could not have been on notice that Plaintiff

18

was complaining about discrimination against her on the basis of her sex. Plaintiff's only arguable allusions to sex were her naming of female employees, including herself (specifically, "they are not looking for a 'Sarah'" and "I could never imagine treating Megan this way," which referred to Plaintiff's supervision of Megan Bell), but that is not enough under Sixth Circuit precedent. Similarly, Plaintiff's statement of "I'm contacting an attorney and we'll go from there" also is insufficient because it could have referred to any number of legal claims, such as wrongful discharge or retaliation under the FMLA (which the Court will address in the next section), and not specifically Title VII or the THRA. Plaintiff stated that she "was retaliated against by my current boss because [she] wanted to leave the department," but the mere mention of "retaliation"—just like the mere mention of "discrimination"—cannot trigger Title VII or the THRA. Indeed, the overall thrust of Plaintiff's complaints was that she felt Crowe and Walden Security treated her unfairly. Plaintiff herself wrote, "All of this [happened] because I wanted to talk to my leadership about 'Career Planning.'" (Doc. 34-1 Ex. 10 at 1.) "Complaints about the way a business is being run, or even 'complaints concerning unfair treatment in general' are insufficient to constitute protected activity if they do not 'specifically address discrimination.'" *Philip*, 2010 WL 4318880 at *11 (quoting *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793–94 (S.D. Ohio 1998)). Thus, Plaintiff's retaliation claims must fail.

After considering all the evidence in the light most favorable to Plaintiff, the Court finds that no reasonable jury could find in Plaintiff's favor because she cannot demonstrate that she engaged in protected activity, which is the first element required for a viable retaliation claim under

both Title VII and the THRA. Accordingly, the Court will dismiss Plaintiff's Title VII and THRA retaliation claims.

### C. FMLA Interference and Retaliation

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). It is also "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at (a)(2). The Sixth Circuit recognizes the interference and retaliation theory of recovery under the FMLA. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Plaintiff brings claims alleging that Defendant interfered with her rights under the FMLA and retaliated against her for asserting her rights under the FMLA. The Court will first address her prima facie interference claim before turning to her prima facie retaliation claim.

### 1. Interference

To establish a prima facie claim for FMLA interference, a plaintiff must show: "(1) he is an eligible employee; (2) the defendant is an employer; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled." *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (citations omitted) (quoting *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)). Here, Defendant disputes the third element— whether Plaintiff was entitled to leave under the FMLA—and the fourth element—whether

Plaintiff gave Defendant notice of her intention to take FMLA leave. (*See* Doc. 32 at 18.) The Court will address each in turn.

For a plaintiff to show that she is entitled to FMLA leave, she must show that she has a "serious health condition." A plaintiff cannot survive summary judgment "by merely alleging her ailment to be such a condition." *Barger v. Jackson, Tenn. Hosp. Co., LLC*, 92 F. Supp. 3d 754, 761 (W.D. Tenn. Mar. 13, 2015) (citing *Perk v. Nyrstar Clarksville, Inc.*, 2014 WL 1379170, at *3 (M.D. Tenn. Apr. 8, 2014)). Under the FMLA, a "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "Continuing treatment" is defined as a "period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition." 29 C.F.R.§ 825.115(a). There must also be

> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider . . . or (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

*Id.* The regulations explicitly provide that "treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity." *Id.* at (a)(3). "Extenuating circumstances" is defined as "circumstances beyond the employee's control," such as the health-care provider not having any available appointments during the thirty-day statutory period. *Id.* at (a)(5). "Incapacity" is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). "Treatment" includes, but is not limited to, "examinations to determine if a serious health condition exists and evaluations of the condition." *Id.* at (c). "[C]ontinuing treatment includes, for example,

21

a course of prescription medication." *Id.* "Mental illness . . . may be [a] serious health condition[], but only if all the conditions of this section [defining a serious health condition] are met." *Id.* at (d).

Plaintiff argues that she received treatment two or more times within thirty days of the first day of incapacity: "She received treatment via text with Dr. Hitchcock on July 31, 2019[,] and had an in person visit with Dr. Sanders on August 7, 2019." (Doc. 34 at 15.) Next, she argues that she was incapacitated for more than three consecutive calendar days because she was off from work on Wednesday, July 31, 2019; Thursday, August 1, 2019; and Friday, August 2, 2019. (*Id.* at 16.) She came into the office on Monday, August 5, 2019, upon Smith and Schmissrauter's request "only to discuss her complaint against Mr. Crowe as set forth in her" July 31, 2019, email, so she "did not return to work on August 5." (*Id.*) During the August 5 meeting, Schmissrauter told Plaintiff "to go home and think about whether she was going to return to work." (*Id.* at 16–17.)

Defendant argues that Plaintiff cannot meet the threshold requirement of being incapacitated for more than three consecutive calendar days because she returned to the office on August 5, 2019. (Doc. 37 at 14.) Defendant also cites Plaintiff's deposition, where she said that she would have been able to work at home when she had taken off from work from Wednesday 31, 2019, to August 2, 2019. (*Id.*) With regards to the medical treatment, Defendant argues that Plaintiff's texts to Dr. Hitchcock on July 31, 2019, do not qualify as treatment by a health-care provider. (*Id.* at 18.) Thus, Defendant argues that Plaintiff did not have a serious health condition under the FMLA.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that there is a genuine dispute of material fact as to whether Plaintiff qualified as having a serious health condition. Plaintiff was out of the office from July 31, 2019, through August 2, 2019, which

is three consecutive calendar days.  If she were also incapacitated on August 3, 2019, then she would have met the statutory requirement of being incapacitated for more than three consecutive calendar days.  But neither party has presented evidence as to whether Plaintiff was incapacitated on August 3, 2019.  The Court also rejects Defendant's argument that if Plaintiff were not incapacitated on Monday, August 5, 2019, she could not have been incapacitated for more than three consecutive calendar days.  The FMLA requires an employee to be incapacitated for more than three consecutive *calendar* days, *not* three consecutive workdays or weekdays.  29 C.F.R. 825.115 (defining a period of incapacity as "more than three consecutive, full calendar days").  Additionally, there is a genuine dispute of material fact as to whether Plaintiff was incapacitated on August 5, 2019.  Plaintiff claims that she was only in the office to discuss her July 31, 2019, email—not to work.  In her deposition, she testified that she did not go to her office or perform any work-related duties that day.  (Doc. 34 at 16–17.)   The Court cannot decide this dispute of fact at the summary-judgment stage.   In addition, Plaintiff presented medical records demonstrating that she had an in-person visit with Dr. Sanders on August 7, 2019, and was prescribed twenty tablets of hydroxyzine to take every eight hours as needed for anxiety.  (Doc. 32-18 at 11.)  Her first in-person visit took place within the statutory requirement of seven days within the first day of incapacity (August 7, 2019, is within seven days of July 31, 2019), and Dr. Sanders initiated a course of continuing treatment with the hydroxyzine prescription for anxiety.

Defendant has failed to carry its burden of showing that no reasonable jury could find that Plaintiff did not have a serious health condition that would entitle her to leave under the FMLA.

Next, the Court will address whether Plaintiff gave notice of her request for FMLA-qualifying leave.

To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave, but the employee does not have to expressly assert her right to take leave under the FMLA. *Cavin*, 346 F.3d at 724 (first quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998); then quoting *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999)). An employee does not need to invoke the FMLA expressly, so there is sufficient notice when the employee gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA has occurred. *Cavin*, 346 F.3d at 723–24 (quoting *Hammon*, 165 F.3d at 451). Adequacy of the employee's notice is a fact- and case-specific inquiry. *Cavin*, 346 F.3d at 724 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).

Here, Plaintiff had sent an email with the subject line of "Assistance Needed" on July 31, 2019, to Smith and Schmissrauter. (Doc. 37-12 at 2.) In relevant part, it stated:

- "I have 3 kids that need my support and income so I am extremely fearful of where this email may lead, however I have to wave my white flag." (*Id.*)
- "Every day is a struggle for me to work around [Crowe] or even see him. It sets off anxiety, fear that I have to experience another situation as I experienced back in June . . . or the continuous treatment he does towards me regularly." (*Id.*)
- "So this is me coming to you guys so I don't suffer in silence anymore." (*Id.*)

On July 31, 2019, Smith responded:

Kurt and I are in receipt of your email. Your health is of course our first concern. I will be sending you FMLA paperwork under separate cover. Do you know right off how much time you anticipate needing off due to your medical condition? Once

24

you have returned [Schmissrauter] and I would like to schedule some time to sit down and talk.

(*Id.*)

Plaintiff argues that Plaintiff's July 31, 2019, email constituted sufficient notice. (Doc. 34 at 20.) Her email detailed the anxiety she was experiencing, how it affected her ability to do her job, the treatment she sought, and that she needed time off from work to address her problems. (*Id.*) Thus, Plaintiff argues, "[t]his is not a case where the employee calls in and merely states he or she is 'sick' or 'unable to work' without more detail indicating that the leave is for an FMLA-qualify [sic] reason." (*Id.*) Moreover, Smith and Schmissrauter had "acknowledged the sufficiency of [Plaintiff's] notice by stating that they would be providing her with FMLA paperwork to take to her employer [sic] to have completed and returned to [Defendant]." (*Id.*)

In response, Defendant argues that Plaintiff did not tell Defendant she was unable to work, only that she could not work with Crowe, and that she presented "zero evidence" that a health-care provider directed her to remain off work because of her health. (Doc. 32 at 22.) Instead, Dr. Hitchcock had only asked if she had a therapist; he never diagnosed her with a serious health condition or recommended that she refrain from working. (Doc. 37 at 21.) Defendant argues that Plaintiff's July 31, 2019, email "contrasts sharply" with the "point blank" notices given in *Easter v. Asurion Insurance Services, Inc.*, 96 F. Supp. 3d 789, 795 (M.D. Tenn. 2015) ("Plaintiff claims that she repeatedly told her employer that she had IBS and stomach problems that . . . affected her ability to get to work on time, and impacted the time that she was at work due to the need for frequent bathroom breaks."), and *Giles v. Wilson County Board of Education*, No. 1:17-cv-896,

2018 WL 4680335, at *5 (M.D. Tenn. 2018) ("[P]roviding specific information as to the cause of her absence as being her condition is sufficient notice of FMLA qualifying condition.").

After reviewing the evidence in the light most favorable to Plaintiff, the Court agrees with Plaintiff that there is a genuine dispute of material fact as to whether Defendant was on notice of Plaintiff's intent to take leave under the FMLA. Smith wrote that she would send Plaintiff the "FMLA paperwork under separate cover" and she asked Plaintiff how much time she would anticipate needing to take off "due to [Plaintiff's] medical condition." (Doc. 37-12 at 2.) Smith's response to Plaintiff's email demonstrates that Defendant probably was given sufficient notice that Plaintiff was seeking time off for an FMLA-qualifying condition. Accordingly, the Court does not agree with Defendant's argument that it was not given notice of her intention to take FMLA-qualifying leave.

In sum, there are genuine disputes of material fact as to whether Plaintiff was entitled to leave under the FMLA and whether she gave Defendant notice of her intent to take FMLA leave. Because two elements of Plaintiff's FMLA-interference claim are in dispute and would be questions for the jury, the Court will deny Defendant's motion for summary judgment on Plaintiff's claim of FMLA interference.

### 2. Retaliation

To establish a *prima facie* claim for FMLA retaliation, a plaintiff must show that:

(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). "A plaintiff's burden in establishing a prima facie case

26

is not intended to be an onerous one." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (quoting *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)).

Here, Defendant disputes each element of Plaintiff's FMLA retaliation claim. Defendant again argues that Plaintiff did not have a serious health condition, so she was not engaged in an activity protected by the FMLA. (Doc. 32 at 23.) And even if she met the FMLA's threshold requirements, Defendant argues it did not know that she was exercising her rights under the FMLA because she failed to give notice of her intention to take FMLA leave. (*Id.*) In addition, Defendant argues Plaintiff voluntarily resigned from her job, so Defendant had not taken an adverse employment action against Plaintiff. Finally, Defendant argues Plaintiff has not presented any evidence that her alleged protected activity was connected to the alleged termination of her employment. (*Id.* at 24.)

In response, Plaintiff argues she "was told to return to work or be terminated and there was no action taken to address her request for FMLA leave." (Doc. 34 at 23.) She "never resigned her employment" because she "took all necessary and reasonable steps to protect her employment." (*Id.*) And the "temporal proximity of [Plaintiff's] request for leave and her termination provides the causal connection, along with the fact that Walden has not provided a legitimate reason for her termination." (*Id.*)

Many of the facts supporting Plaintiff's FMLA retaliation claim are the facts supporting her FMLA interference claim. On July 31, Plaintiff sent an email to Smith and Schmissrauter with the subject titled "Assistance Needed." (Doc. 37-12 at 2.) Plaintiff wrote, "I know that I cannot work around [Crowe] anymore. Every day is a struggle for me to work around him or even see him. It sets off anxiety, fear that I have to experience another situation as I experienced back in June . . . ." (*Id.*) Smith responded, confirming that she and Schmissrauter had received Plaintiff's

email.  (*Id.*)  Smith also wrote, "I will be sending you FMLA paperwork under separate cover.  Do you know right off how much time you anticipate needing off due to your medical condition?"  (*Id.*)  On August 5, 2019, Plaintiff sent an email to Smith and Schmissrauter with the subject titled "Follow-up #2," where she wrote, "If I do not feel that a meeting with them is in my best interests for my mental health does that mean termination?  If so, [w]hen would be my last pay and would I be given any of my vacation pay?"  (Doc. 37-14 at 3.)  Smith responded:

> If you are unwilling to continue in your current position with Walden Security we do not have anything else available at this time.  You are welcome to apply for any open positions we have available however should you chose not to continue in your current role your last pay date would be August 16th.

(*Id.* at 2.)  Plaintiff responded, "I am not unwilling to continue, according to medical advice it is not in my best interests for my mental health."  (*Id.*)

On August 6, 2019, Schmissrauter replied to Plaintiff.  (Doc. 37-7 at 3.)  In relevant part, his email stated:

> [I]f there is a documented medical reason limiting your ability to work in your current position, we would consider transferring you to a vacant position for which you are qualified.  At present, though, there is no such position.  If there is a position in which you are interested that you believe you are qualified for, you are welcome to apply for it—your application will be considered the same as any other applicant's, and our decision will be merit-based.

(*Id.*)  Plaintiff responded at 9:48 a.m.  (*Id.*)  She wrote, "I should have done what was recommended to me from the beginning, but I never thought you would put me in this situation. . . . All of this because I wanted to talk to my leadership about 'Career Planning[.]'  I'm contacting an attorney and we'll go from there."  (*Id.*)  At 10:13 a.m., Schmissrauter replied:

> Your e-mail and message has [sic] been received.  It is our understanding that you have chosen to end your employment with Walden Security and you are contacting an attorney.  Please contact [Smith] and the HR department with any questions related to your final paycheck, benefits and to arrange the return any equipment you

28

may have including your computer. Be advised that your Walden e-mail will be promptly shut-off upon receipt of this e-mail.

(*Id.*) At 10:59 a.m., Smith emailed other Walden Security employees with the subject titled "Resignation – Sarah McPherson": "Effective immediately, Sarah has decided to resign her position with Walden Security." (Doc. 37-9 at 2.)

After reviewing the evidence in the light most favorable to Plaintiff, the Court agrees with Plaintiff that there is a genuine dispute of material fact as to whether Defendant unlawfully retaliated against her for exercising her rights under the FMLA. As previously stated in the Court's discussion of Plaintiff's FMLA interference claim, there are genuine disputes of material fact as to whether Plaintiff had a serious health condition that would render her eligible under the FMLA and whether Plaintiff's July 31, 2019, email provided sufficient notice that she was exercising her rights under the FMLA. There is also a genuine dispute of material fact as to whether Defendant unlawfully terminated Plaintiff's employment or she voluntarily resigned. Although Smith and Schmissrauter couched Plaintiff's departure from Walden Security as a resignation, their framing is far from dispositive given that Plaintiff wrote, "I am not unwilling to continue," and the evidence of record does not suggest that she resigned. Indeed, there is nothing in the record suggesting that Plaintiff had voluntarily resigned during her in-person meeting with Schmissrauter and Smith on August 5, 2019. Plaintiff testified in her deposition that she did not quit, which is a factual issue that must be assessed by the jury. Finally, as to whether there was a causal connection between Plaintiff's alleged termination and Plaintiff's protected FMLA activity, Defendant has not met its burden as the movant in showing that no reasonable jury could find that there was a causal connection. At the summary-judgment stage, the moving party—and not the nonmoving party— bears the burden of coming forward with proof that it must prevail as a matter of law. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The Sixth Circuit has "held that

proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (first citing *Skrjanc*, 272 F.3d 314; then citing *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir. 2002)).  Plaintiff presented evidence supporting her assertion that she experienced an adverse employment action on August 6, 2019, which is six days after she allegedly gave notice to Defendant of her intent to take FMLA leave.  Given the proximity between her notice to take FMLA leave and the alleged adverse employment action, a reasonable jury could find that there is a causal connection between the two events.  Thus, her FMLA retaliation claim survives summary judgment.

Accordingly, the Court will deny Defendant's motion for summary judgment on Plaintiff's FMLA retaliation claim.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for partial dismissal (Doc. 32).  Plaintiff's claims of sex-based harassment and Title VII and THRA retaliation are **DISMISSED WITH PREJUDICE.**

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**